[Civ. No. 3010.  Third Appellate District.—February 2, 1926.]

THE CITY OF STOCKTON (a Municipal Corporation), Appellant, v. JACOB G. VOTE, Respondent.

[1] EMINENT DOMAIN—CONDEMNATION OF LAND—EASEMENTS—REPORT ON FLOOD CONTROL—EVIDENCE.—In a proceeding in eminent domain to condemn a flowage easement over defendant's land for flood control purposes, a report of an engineer dealing with flood control problems and referring to government maps and tables, copies of which were contained therein, was inadmissible in evidence, where the report showed upon its face that it was not a state document, but merely a compilation of statistics and the opinion of the engineer making it.

[2] ID.—PUBLIC RECORDS—EVIDENCE—SECTION 1918, CODE OF CIVIL PROCEDURE.—In such proceeding, the fact that plaintiff made no objection to the introduction of the report on the ground that it was not properly authenticated did not make the opinions and theories therein contained admissible in evidence as a public document under section 1918 of the Code of Civil Procedure, where

the report was not made in pursuance of any duty enjoined by law, but shows that it was undertaken in the absence of such authority, and constituted nothing more than the private compilation, theories, and opinions and estimates of the engineer making it.

[3] ID.—DEPARTMENT OF PUBLIC WORKS—REPORTS OF SUBORDINATE OFFICERS—EVIDENCE.—No section of the Political Code, relating to the department of public works, makes the report of a subordinate officer or field officer to his superior a public document admissible in evidence in controversies between independent parties.

[4] ID.—MUNICIPAL CORPORATIONS—USE OF IMPOUNDED WATERS—REPORT OF CITY MANAGER—EVIDENCE.—In a proceeding in eminent domain by a city to condemn a flowage easement over land for flood control purposes, the fact that the city council had by resolution adopted a report of the city manager dealing with flood control problems did not authorize the admission in evidence of such report which consisted of purely hearsay arguments and opinions of the city manager as to the feasibility of using the impounded waters for irrigation and power purposes.

[5] ID.—ADOPTION OF REPORT BY CITY COUNCIL—ADMISSIONS.—In such proceeding, the adoption by the city council of the report of the city manager did not constitute an admission against the interest of the city, where the council at the time of the resolution adopting it had no authority to undertake the contemplated work of flood control.

[6] EVIDENCE—ADMISSIONS.—It is one of the cardinal principles of an admission that the party speaking must be in a position of authority to speak.

[7] EMINENT DOMAIN — FLOWAGE EASEMENT — BENEFICIAL USES — MARKET VALUE—EVIDENCE.—In a proceeding in eminent domain to condemn a flowage easement over defendant's land, the purposes for which the water is to be used by plaintiff and the beneficial uses to be derived therefrom are not to be taken into consideration in determining market values, although availability may be shown; but the purposes and uses, necessity and values of or to the plaintiff are wholly irrelevant matters which tend to base the estimate of market value on what plaintiff can afford to pay rather than forego the exercise of the right of eminent domain.

[8] ID.—USE OF IMPOUNDED WATERS—SPECULATIVE PURPOSES EVIDENCE—VALUE.—In such proceeding, reports of engineers detailing conjectural and speculative purposes to which the impounded

6.   See 10 Cal. Jur. 1083; 1 R. C. L. 483.

7.   See 10 Cal. Jur. 131, 339.

waters might be put were erroneously admitted in evidence in determining the market values of the land sought to be condemned.

[9] ID.—NECESSITIES OF THE PUBLIC—VALUE—EVIDENCE.—In such a proceeding, the necessities of the public are never taken into consideration in fixing the value of the land to be condemned.

[10] ID.—GROWTH OF CITY—NEED FOR FUTURE WATER SUPPLY—EVIDENCE.—In such proceeding, the growth of the city with respect to its need for a future water supply cannot be considered in determining the market value of the land sought to be condemned, and evidence respecting such growth was inadmissible.

[11] ID.—MARKET VALUE—MEASURE OF DAMAGES.—In such proceeding evidence of the value in use of the land sought to be condemned was inadmissible, the present market value being the measure of damages rather than the value in use.

[12] ID.—VALUE OF LAND FOR RESERVOIR SITE.—In such a proceeding, the market value of the land is not to be determined by the fact that the party seeking to condemn it has already determined to build a reservoir thereon.

[13] ID.—VALUE TO PURCHASERS GENERALLY—EVIDENCE.—Matters which anyone contemplating the purchase of land might take into consideration in determining its value are proper to be laid before the jury in determining the value of land sought to be condemned.

[14] ID.—CONSIDERATION OF USES TO WHICH LAND IS ADAPTABLE—EVIDENCE.—In a proceeding in eminent domain to condemn a flowage easement over defendant's land for flood control purposes, the fact that the highest use of the land to which it was adapted for such purposes would be subserved by a two hundred foot dam was admissible in evidence, and the testimony on the part of persons qualified to speak on such subjects was properly laid before the jury.

[15] ID.—UTILITY OF LAND—VALUE—EVIDENCE.—In such proceeding, the fact that the party seeking to condemn was not proposing to make the highest use of the condemned property is not a matter to be taken into consideration in determining values.

[16] ID. — ADAPTABILITY FOR RESERVOIR PURPOSES — ACQUISITION OF OTHER TRACTS—VALUE.—In such proceeding, the adaptability of defendant's land for reservoir purposes may be taken into con-

11.  See 10 Cal. Jur. 338.

13.  See 10 Cal. Jur. 338.

15.  See 10 Cal. Jur. 339.

sideration in determining the value of the land to be condemned, although his land alone does not constitute an entire reservoir site and a complete reservoir site requires the joining of his land to a number of other tracts of land belonging to different owners.

[17] ID.—INABILITY TO ACQUIRE OTHER TRACTS—EVIDENCE.—In such proceeding, if it should appear that there are other lands which the defendant does not own and cannot acquire in order to constitute an entire reservoir site, the value of the land for reservoir purposes should be eliminated.

[18] ID.—PRACTICABILITY OF UNITING LANDS IN ONE OWNERSHIP—VALUE—INSTRUCTIONS.—In such proceeding, the practicability of uniting the lands in one ownership, for reservoir purposes, the cost and expenses thereof, and the time consumed in so doing, are elements of fact which would bear upon the market value of the lands and would be considered by any *bona fide* purchaser of the land purchasing for any purpose for which the land is reasonably adapted; and where the land is only a part of a larger tract owned by a number of individuals, all of these facts should be submitted to the jury under proper instructions to take into consideration whether the location of the land does or does not add to its market value by reason of its adaptability for reservoir purposes when joined to other lands.

[19] ID.—OPINIONS OF EXPERTS—EXAMINATION OF WITNESSES—PRACTICE.—In permitting hypothetical questions of experts, the better practice is to set forth the facts upon which it is sought to illustrate the opinion of the witness being examined; but, in this action in eminent domain, any error of the trial court in permitting hypothetical questions to be answered where the questions simply set forth as a basis the hearing by the expert of the testimony of other witnesses, was not sufficient, in and of itself, to warrant a reversal.

[20] ID.—EVIDENCE—TESTIMONY OF EXPERTS—PREJUDICIAL ERROR.—In such proceeding the admission in evidence of the testimony of engineers as expert witnesses relating to the value to be derived by the plaintiff from the use of defendant's land was prejudicial to the rights of the plaintiff under section 4½ of article VI of the constitution.

[21] ID.—COSTS—APPEAL.—In a condemnation proceeding a land owner is entitled under the law to the full value of his land when finally ascertained, exclusive of costs, and on appeal by the

19.  See 10 **Cal. Jur.** 968.

21.  See 10 **Cal. Jur.** 434.

condemnor the land owner will recover his costs although the judgment of the lower court in his favor is reversed.

(1) 22 C. J., p. 803, n. 26, p. 805, n. 53.   (2) 22 C. J., p. 209, n. 68, p. 803, n. 26.   (3) 22 C. J., p. 803, n. 25.   (4) 22 C. J., p. 209, n. 68.   (5) 22 C. J., p. 392, n. 99.   (6) 22 C. J., p. 369, n. 1.   (7) 20 C. J., p. 986, n. 73.   (8) 20 C. J., p. 773, n. 83, p. 986, n. 73. (9) 20 C. J., p. 986, n. 73.   (10) 20 C. J., p. 986, n. 73.   (11) 20 C. J., p. 728, n. 37, p. 986, n. 73.   (12) 20 C. J., p. 776, n. 4, p. 986, n. 73.   (13) 20 C. J., p. 986, n. 72.   (14) 20 C. J., p. 985, n. 70.   (15) 20 C. J., p. 772, n. 77.   (16) 20 C. J., p. 769, n. 76. (17) 20 C. J., p. 769, n. 76, p. 1015, n. 64.   (18) 20 C. J., p. 1015, n. 64, p. 1017, n. 74.   (19) 20 C. J., p. 1120, n. 23.   (20) 20 C. J., p. 1120, n. 23.   (21) 20 C. J., p. 1137, n. 55, p. 1139, n. 86.

APPEAL from a judgment of the Superior Court of Calaveras County. J. A. Smith, Judge. Reversed.

The facts are stated in the opinion of the court.

J. LeRoy Johnson, Thos. S. Louttit and Tom H. Louttit for Appellant.

Nutter, Hancock & Rutherford, F. J. Solinsky and A. P. Hayne for Respondent.

PLUMMER, J.—Pursuant to certain resolutions passed by the city council of the City of Stockton and the affirmative result of an election participated in by the qualified electors of the City of Stockton, the plaintiff in this action proposes to erect a restraining dam, or a dam to control the flood waters of the Calaveras River at a point on said stream in the county of Calaveras about three miles from the town of Valley Springs. The defendant in this action is the owner of a tract of land lying easterly of the site of the proposed restraining dam and a portion of whose land lies within the basin that would be submerged in the operation of the dam herein referred to. By its amended complaint in this action the plaintiff seeks to condemn or. acquire a flowing easement for the flood waters restrained by the proposed dam over 66.6 acres of the lands belonging to the defendant, and sought a judgment of the court fixing the price of said easement, damages to be allowed for the improvements situated on the said 66.6 acres, and also such sum as should

be justly awarded on account of the severance of said area of land from the larger acreage belonging to the defendant.

Upon the trial of this action had before a jury the value of the land proposed to be taken by the City of Stockton for flowage purposes was fixed at the sum of $6,606; the value of the improvements taken, $10,000; and the damages due to the severance assessed at the sum of $3,400, aggregating the total sum of $20,000. Judgment was entered accordingly. From this judgment the plaintiff appeals.

In support of its appeal the appellant alleges, among others, that the trial court erred in the following particulars: 1. In considering the term "market value"; 2. That testimony was improperly admitted showing possible value of property in use by condemnor; 3. That testimony concerning the value of the defendant's land under altered conditions was improperly admitted; 4. That the court erred in admitting evidence concerning the reasonable value of defendant's land, assuming that other necessary lands had been and would be joined to that of the defendant; 5. That witnesses not properly qualified were permitted to give opinion evidence concerning the value of the defendant's land; 6. That witnesses were allowed to answer hypothetical questions based upon the testimony of other witnesses; 7. That the court erred in admitting a report made by Charles E. Ashburner to the city council of the City of Stockton, and also a report on flood problems of the Calaveras River, signed by one Harry Barnes.

The record shows that the City of Stockton proposes to erect a restraining dam of the height of 144 feet on the Calaveras River at the site above mentioned, that by means of spillways and flood-gates, it proposes to control the flood waters of the Calaveras River during the rainy season in such manner as to avoid the danger of periodical flooding, to which the City prior to the year 1911 was subject, that just prior to the year 1911 a diverting canal had been built to the east and north of the City of Stockton, by means of which the flood waters of the Calaveras River were diverted around the City and inundation avoided; that the diverting canal, however, throws the flood waters back upon adjoining agricultural lands and does not afford the City of Stockton sufficient immunity from the flood waters coming down from the watershed of the Calaveras River; that

by means of the proposed restraining dam the flood waters gathered by the Calaveras River would be allowed to escape from the reservoir created by the dam in such quantities only as would not endanger the flooding of the City of Stockton or any of the adjoining territory. Between the City of Stockton and the site of the proposed dam there are several thousand acres of land, called the "plain land," before the foothills, which gradually merge into the Sierra Nevada Mountains, are reached. The ascent from the plain lands just referred to to the site of the proposed dam is more or less gradual so that the elevation of the foot of said dam is estimated to be at about 530 feet above the level lands lying to the west of the foothills referred to herein. The dam proposed to be erected by the appellant, when completed, will have a maximum elevation of 680 feet and the 680-foot contour line mentioned in the testimony is the maximum flood line that would be reached by the waters impounded by the proposed dam, and is the maximum line to which and for which the flowage easement was asked for by and awarded to the plaintiff in this action.

The testimony introduced on the part of the defendant, in most part, had reference to and directed to a possible dam, 200 feet in height, that might be erected on the site selected by the City of Stockton, placing the maximum flood contour line at an elevation of 730 feet. Four expert witnesses were placed on the stand by the defendant and severally proceeded to testify as to the possibility of erecting a 200-foot dam, also as to 394 square miles of watersheds lying easterly of the dam; that such a dam would have a reservoir capacity of about 350,000 acre-feet, and would afford water for irrigation purposes of from 34,000 to 50,000 acres of land situate in the foothills and plain lands of Calaveras and San Joaquin Counties; that such a reservoir would afford water for domestic purposes for the cities of Lodi, Stockton, Antioch, and other places, and also might be used for power purposes at a point near Jenny Lind, in the county of Calaveras, where a drop of 200 feet might be had. The reports of Ashburner and Barnes go into detail of the projects mentioned by the expert witnesses and the possibilities attendant upon the construction of such a dam, the Barnes report going into detail as to estimated costs. A consideration of the question presented upon this appeal

necessitates the setting forth of sufficient testimony to illustrate the points involved. All of the testimony hereafter set forth was introduced and admitted over the objections of the plaintiff, and the testimony will therefore be set forth, omitting the several objections. The testimony of the experts was along the same general lines, and, therefore, the testimony of one expert will illustrate the testimony of all, save and except as may be necessary to supplement the general recital in order to properly consider the objections raised.

Mr. M. O'Shaughnessy of San Francisco, a witness called on the part of the defendant, after detailing at length his qualifications and experiences as an engineer, testified partly as follows: "I have been on this reservoir basin three times; I know the portion of the reservoir that is at the western outlet of this river, and which has been testified to, and designated the dam site, where the structure to hold the waters will be constructed; I have observed at what height a dam or embankment can be constructed on that site; I believe it could be economically built up to a height of 200 feet. . . . Q. What purpose would such an embankment built at that point serve so far as you can judge from your examination of that locality? A. That dam would serve to impound a very large body of water behind it, which has a value for many purposes. It has a value for domestic use for cities; it has a value for irrigation use for farming; it has a value also for power use to take the energy out of it, and it is also of a subsidiary value for a regulating reservoir provided enough spillways will pass through the dam to pass the floods. Q. Do you know the location of this dam to any irrigable lands upon which the water from this dam could be used? A. Yes. Q. Where are such irrigable lands located? A. From the foothills where the stream discharges on the San Joaquin valley over towards Stockton; all those lands adjacent to the stream are capable of development by irrigation. Q. Do you know whether or not they are subject to gravity irrigation? Which are now being irrigated by the flowing of water on to those lands from any ditches or aqueducts? A. I would say in a moderate way by wells. Q. In your opinion as an engineer what would be the economical manner of irrigating those lands if such a reservoir as you have mentioned could be constructed and

filled with water? A. The water would be allowed to flow down the stream bed, released from the dam to a lower level and then lead out by canals on each side of the river, one canal flowing northerly and the other southerly, to main line canals, such as are constructed on the Stanislaus River and on the Tuolumne River for irrigating those lands; a canal on each side of the river bed. Q. Have you obtained data as an engineer as to the contents of water in this dam constructed to the height of two hundred feet, assuming that sufficient water would be running in the Calaveras River into the canal? A. I have. Q. And what does that data show, the data to be the contents of that dam when it was built to the height of two hundred feet, the contents of the reservoir? A. The volume behind a two hundred foot dam will amount to three hundred fifty thousand acre feet of water at an elevation of the 730-foot contour. Q. 730-foot contour, as I understand, gentlemen, is an elevation of a two hundred foot dam; 530 is the bed of the river and 730 foot to the crest of the dam would be a two hundred foot embankment. Now, Mr. O'Shaughnessy, I show you here defendant's Exhibit 'C' which is table 93, showing the seasonal runoff data of the Calaveras River with a drainage area of 394 square miles, and ask you to examine that? A. I have seen this report before. Q. Will you state to the court and jury whether, in your opinion, the runoff of water in the Calaveras River as shown thereon would be sufficient to fill this reservoir on the Calaveras River to the height of two hundred feet during many, if not all of the years? A. From this table of estimated seasonal runoff in acre feet, it looks as if that size reservoir could be filled practically half the years between 1871 and 1921. In some years, like '88, '89, the runoff is a million three thousand acre feet; another year, I am familiar with the year 1889 and 1890. Q. Now, speaking of this reservoir from the standpoint of its irrigation value, in your opinion, would it be sufficient at a height of two hundred feet carrying a volume of three hundred fifty thousand acre feet to carry over two years of irrigation if that became the proper plan of using it for that purpose? A. Well, there are two factors entering into that. The first, the extent of area you would irrigate and secondly the amount of water you would apply. Q. So you would be obliged then to first determine the quantity of land

that could be economically irrigated from this reservoir and the quantity of water that you would apply to each acre of the tract so selected? A. You would have to have those two factors to determine the total volume of water you would need, and also the losses in transmission; the aque-- ducts leak and the ditches leak, and you have got to have a percentage to take care of that leakage. Q. Now, state, in your opinion, whether that leakage would become of a serious nature considering the location of this reservoir and its relation to the irrigable lands, and taking into account the distance. A. It wouldn't be any more difficult than the problems met by the successful irrigation districts imme- diately to the South. Q. Referring to what districts? A. South San Joaquin Irrigation District; the Oakdale Irri- gation District; the Modesto Irrigation District; the Turlock Irrigation District; the Merced Irrigation District. Q. Have you made any determination in your own manner as an engineer as to what quantity of land on the San Joaquin valley plains could be economically irrigated with water from this reservoir taking into account these factors of the amount of land or quantity of water on it to be used for irrigation and taking into account the seasonal flow of water as determined from defendant's Exhibit 'C' that you have just read? A. I have. Q. Will you state what your opin- ion is in answer to that question? A. There are about thirty-four thousand acres of land available for irrigation immediately below this river. Q. And state whether or not in your opinion, following that question up, that that thirty- four thousand acres could be economically irrigated by this dam under conditions I have stated? A. That area can be economically irrigated. Q. And in your opinion on the opportunities you have had of examining the data of this stream would you say that on such a stream such a reservoir would hold enough water to irrigate thirty-four thousand acres of property each year? A. That is my opinion. Q. Will you state to what other uses the water stored in this reservoir could be used? A. The water is at a high enough level above the sea, or over five hundred feet elevation, so it can be conveyed by gravity through pressure pipes to towns in the San Joaquin valley conveniently accessible, and this is a very great value, because lots of the valley water used by those present towns at present is objection-

able in character. Q. I will direct your attention particularly to the city of Stockton as one of those municipalities on the plain, are you familiar with the city water of Stockton that is now being used? A. I am. Three years ago I examined the water situation in Stockton, examined the little sumps or reservoirs that they pump water into and went up to one of those reservoirs and found a boat there with a rake, to rake the moss off the water, green moss, green scum, and this scum formed as the water was pumped from the lower levels; the wells, I think, were six or seven hundred feet in depth, and this scum formed on the reservoirs and had to be raked off so that a body of water of this kind, pure, soft mountain water would certainly be a great value to the city of Stockton or to any other city." It does not appear that any motion was made to strike out this particular answer. "Q. For domestic use? A. For domestic use. I estimated the fall or drop from the reservoir to the plain lands to be about 500 feet. Q. Will you explain to what use that fall of water could be put to? A. Possibly two hundred fifty feet of head could be taken out by means of an aqueduct and pressure pipes and the energy taken out of the water in the shape of power, hydroelectric energy, such as is now being done on the Don Pedro dam on the Tuolumne river and as is proposed to be done on the Exchequer dam on the Merced river; that latter dam or water district has sold the energy from the dam for practically four hundred fifty thousand dollars a year, contracted for a number of years, and I think at least a third of that energy could be taken out of this water or a hundred and fifty thousand dollars a year from the power feature." No motion appears to have been made to strike out this particular answer. "Q. Will you state again whether in your opinion the use of this dam for the storage of water to the two hundred foot height of the dam is or is not an economical use of such dam and the water flowing therein? A. It is the greatest economical use that can be made of that dam site and this reservoir by building a dam to the two hundred foot level. Q. Then I will ask you whether in your opinion the building of a dam and the storage of water as indicated by the blue shading, a dam to the height of 144 feet, is the greatest economical use that could be made of that reservoir site? A. It is not."

The witness then referred to the additional area that would be flooded by the erection of a 200-foot dam. "Q. Then when this reservoir is built and devoted to this highest economical use and value of a two hundred foot embankment and storing the water, this particular hundred and sixty acres of land would be largely submerged, is that true? A. Over a hundred acres of the hundred and sixty. Q. Mr. O'Shaughnessy, are you able to state by an examination of the exhibits and maps that are before you where the two hundred foot contour line would intersect or affect that south hundred and sixty acres? A. Here is the hundred and sixty acres in question and here is the 730-foot contour in the northeast quarter of that one hundred and sixty acres, and it practically covers about one-third of a quarter of a mile, or about four or five hundred feet in depth, running east and west from the easterly line, and practically the same depth north and south." The witness here further described the effect of raising the water to the 730-foot contour, and also stated that raising the water to the 680-foot contour line would flood the improvements on the defendant's lands. The witness was then asked the following question: "Mr. O'Shaughnessy, this is an action brought by the city of Stockton, a municipal corporation, to condemn a perpetual easement and right to flood that portion of the Vote tract of land, of which you are already acquainted and by reference to these exhibits, lying below the 680 foot contour line for the purposes of protecting the city against flood and for the use of impounding waters for such purposes as shall not be inconsistent with flood control, do you know what the market value of that land lying below the 680-foot contour line of the Vote land, within improvements, was on the 27th day of August, 1924, when this action was commenced; by market value I mean the value that it would be sold for for cash in the market, giving the owner of the land, Mr. Vote, a reasonable time in which to make such sale? A. I do. Q. Will you then state to the court and jury, what, in your opinion, was the market value of this Vote land, without improvements, lying below the 680-foot contour line on the 27th day of August, 1924, when this action was commenced, and by market value meaning what I have stated before? A. Taking all conditions of the land into account, the elevation

of the land above the sea, I would say that land is worth fifteen thousand dollars.''

Mr. Galloway, a witness called by the defendant, after detailing his experience as an engineer, testified: ''A dam erected at the point referred to, 200 feet in height would impound 350,000 acre feet; that the water could ·be used for domestic consumption, irrigation, power and the reservoir site could be used for flood control; that the waters could be used for municipal purposes in any of the cities in the immediate vicinity; that it has been proposed to store water in that reservoir site and carry it out to Oakland; the water could be stored in the reservoir, flown down the stream to certain distances, taken out by canals on each side of the river and delivered to the lands adjacent to the river; this reservoir is similar to others along the foothills of the Sierras; the usual procedure is to allow the water to flow a certain distance down the natural channel of the stream, pick it up with a diverting dam, because the lands all lie below the reservoir; therefore, the water will flow by gravity through canals on to the lands; the fall between the reservoir and the first lands to be irrigated is in the neighborhood of four hundred feet; a power plant could be erected so as to use the waters from this reservoir; the power plant could be placed somewhere in the vicinity of Jenny Lind; the uses to which I have referred are the ordinary and usual and practicable uses of the water. Q. Mr. Galloway, you stated that one of the uses that could be made of this reservoir if constructed to the height of two hundred feet and containing the volume of water that has been testified to, three hundred fifty thousand acre feet maximum, what, in your opinion, as an engineer, would such a reservoir take charge of or supply in the way of irrigation and the number of acres? A. The answer to that question involves a statement that there is a certain watershed above the reservoir site from which the water will flow to fill the reservoir and under the conditions of the Calaveras· Reservoir site, the reservoir could and is adapted to be used to irrigate some thirty-five or forty thousand acres of land. Q. Do I understand you, as an engineer, to state that the use of the water for both irrigation and for power can be made at the same time? A. The same idea of the use of water for irrigation and power are carried out in developing

plans in the Merced district on the Merced River. Q. When you say the same idea, I think you have already testified that you have prepared the plans for the construction of the Merced Dam and the development of electricity before the water reaches the Merced plains for irrigation purposes? A. Yes, that was the answer that was intended. Q. You may go right along and explain your answer. A. I am referring to the Exchequer Dam; they are building it, it is more than proposed; it is under construction. I located the power plant there that would give a certain output of energy during the irrigation season, at the time the water was being released from the reservoir for irrigation. The system of the San Joaquin Light and Power Corporation at that place had an electrical demand, a demand for power for pumping for irrigation that came on at the same time, and for the same purpose that the Merced Irrigation District is releasing water from its reservoir for its own purposes, with the result that when the water was taken out of the reservoir for the irrigating season in different amounts, we used it to generate energy and that energy in the form of electricity was transmitted over the line of the power company, and they purchased it, so that when the proposition is built it will return to the irrigation district about five hundred thousand dollars revenue per year. There are some parts of the state where that cannot be done; that depends on the market for power, and I say, I think, that anywhere from the American River south wherever there is an irrigating reservoir proposed a power plant can be built at the base of it and developed and there is a market for that power; so that the two things working together are feasible, practicable propositions. Q. Now, I will ask you again, in your opinion, whether those two uses of water stored in the reservoir contemplated here, the development of power the same time the use of the water that develops the power, for irrigation, is that feasible and practicable? A. It is. Q. Assuming that it has been answered, would you state approximately the amount of water that would be used or could be drawn from that reservoir for municipal supply and whether or not that water would be lost for irrigation? A. Naturally the water would be lost for irrigation if used for domestic supply. The balance of the question is wholly on the matter as to how much

water you would want to take for domestic consumption; in the case of the city of Stockton, the amount taken for domestic supply as compared to the amount required for irrigation is relatively small." The witness then proceeded to state he knew the Vote lands and was then asked the following question: "The action is brought by the plaintiff in this case to obtain a perpetual easement on the Vote lands lying below the 680 foot contour to flow and flood that part of the land for the purposes of protecting the city of Stockton by flood control from floods and for the purpose of using the impounded waters in such a reservoir for such purposes as shall not be inconsistent with the purposes of flood control. I will ask you now with that explanation, what, in your opinion as an engineer, or do you know what the market value of the Vote land lying below the 680 foot contour line, without improvements, was on the 27th day of August, 1924, explaining to you that market value means the price in cash that could be obtained for that portion of the land in the market, giving a reasonable time to the owner of the land to find a purchaser?" Which question the witness answered "16,000.00." The witness further testified that the 680-foot contour would cover a reservoir basin covering 2,900 acres and the 730-foot contour would include an area of about 3,540 acres.

M. C. Polk, a witness called for the defendant, after stating his qualifications and experience as an engineer, testified along the same general lines as testified to by the witness O'Shaughnessy, and testified, in part, as follows: "Q. I will ask you again, to what uses, in your opinion, as an engineer, can be made of this proposed reservoir, or a reservoir on this site filled with water? A. The water impounded in the reservoir could be used for four different purposes: municipal purposes, domestic uses, flood control, and most important in my mind is for irrigation and for power. Q. I will ask you again if the quantity of water that could be stored in this proposed reservoir would be adequate for the City of Stockton, assuming that they have a population of 55,000 people? A. 55,000, being the present population, would use about 10,000 acre feet from the reservoir a season. One year instead of a season, that is not allowing anything for future growth. Q. Assuming that the population of Stockton would be growing and increasing

in population at the rate of 10% per annum, not per annum, no, wouldn't it be for a period of ten years, normal growth? (Johnson interposing) Increase of 84%. Q. What would be the quantity of water necessary to be stored for municipal purposes for a city of such growth? A. In round numbers it would probably be necessary to double that amount, figure on 20,000 acre feet, for not a decade, for two decades probably.'' The witness Polk further described the power possibilities that might be developed from the reservoir holding 350,000 acre-feet of water and then answered the following question: ''Q. Will you now state to the jury in a general way your views as to the use of this water in this dam when constructed to a height of 200 feet for irrigation purposes? A. My engineering work for a number of years has been particularly along the line of irrigation and investigation for water supply for irrigation purposes, and I found and know that all the natural flow of the stream, particularly in the Sacramento and San Joaquin Valley, have been located and in fact over-located, and there is none for irrigation, that there is an endeavor to get storage water almost all over the entire valley area for irrigation, an extreme endeavor you might say, and the site available for storage of water for irrigation, all the available economical sites are practically all used, and I know in fact none as admirably situated as this for irrigation with lands along side needing the irrigation; this being an elevation of about four hundred feet above the plains and only a few miles away relatively speaking, makes it admirable, for that· purpose, not only on the plains but, more or less, on the foothill lands of Calaveras and San Joaquin Counties both, for lands upon which this water can be used, and being situated below the reservoir site, and being capable of storing three hundred fifty thousand acre feet, providing for sufficient holdover to take care of the low years, perhaps not with a full irrigation, or extreme low years, to provide for a safety factor. It seems to me at least fifty thousand acres could be irrigated from that amount of water at an economical operation. Q. Will you tell me how many acre feet to the acre you devote in the irrigation of these lands? A. On similar types and considering conditions I have in my investigations allowed three acre feet of stored water for one acre of land to be irrigated on ordinary crops, that is

such as orchards, alfalfa, the ordinary crops. For rice irrigation it requires a great deal more. Q. Now, the other use that you mentioned that could be made of this reservoir constructed to the height of 200 feet, was flood control? A. Yes, that is true. Q. As an engineer what will you state as to such a use of this reservoir when constructed when devoted to flood control? A. The capacity of the reservoir would seem to me with regulating the holdover would probably take care of the flood control, although there is a little question in that as to the peak floods which might come, but as the factor of safety, I think, they will be safe on that: I haven't worked out the details on that; however, it would require a great deal of study." This witness estimated the value of the 66.6 acres over which the plaintiff was seeking an easement at $16,000.

N. Randall Ellis, a witness called by the defense, after stating his qualifications and experiences, testified along the same general lines as that of the other experts. He testified as to his experience with the installation of power plants, the uses of water for irrigation and power purposes, the situation of the reservoir in question, that he had given consideration to the subject of the use of a portion of the waters impounded by a dam 200 feet in height erected on the site in question, and was asked the following questions: "Q. Will you state what consideration you gave to that particular use? A. Yes, sir, with my familiarity with the growing demands for water throughout California, throughout all municipalities, some familiarity with the existent situation in Stockton and in all valley towns, I believe, that a municipal water supply could be supplemented quite economically for water withdrawal from this proposed reservoir without any appreciable interference with its function either as an irrigation reservoir or with a power by-product." This witness, in answer to a question as to the market value of the land sought to be condemned, answered: "A. I would say sixteen thousand dollars as a minimum value, with a possible differential above that between ten and fifteen per cent. Q. That would mean sixteen thousand dollars with ten per cent differential above that, would be sixteen hundred more, or fifteen per cent above that would be twenty-four hundred more, is that what you mean? A. Yes, sir. In other words, my idea being this, if I may explain my

76 Cal. App.—25

answer. I consider sixteen thousand dollars as a minimum reservoir value; not being absolutely susceptible to a fine mathematical analysis I consider that there is some differential in there; that differential probably would not exceed fifteen per cent above the basic figure that I have stated.''

The testimony set forth in the transcript shows that the land over which the plaintiff was seeking an easement is the ordinary grazing land found in the canyons in the foothills before reaching the higher altitudes of the Sierras. The testimony also shows that the Calaveras River is a ''flash stream,'' not having its source in the perpetual snows of the higher Sierras. Following days of successive rainfall, the Calaveras takes on a turbulent character, but when the rains have ceased, the Calaveras River, as a river, has also ceased. Except during the rainy season, it is a river only by courtesy and carries a volume of water so small as to be negligible for any practical use.

During the cross-examination by the defendant of the witness Hogan, the defendant offered, and over the objection of the plaintiff, the court admitted in evidence, a report signed by Harry Barnes, purporting to deal with flood problems of the Calaveras River, dated October 31, 1919. This report takes up and gives the opinion of the writer upon the subject of controlling the flood waters of Calaveras River; it sets forth a description of the country involved, its physical characteristics, the improvements in the way of levee building and other matters relating to the waters passing over San Joaquin County, contains tables showing annual rainfall, as compiled by the United States gauging station covering the period of years referred to by the witnesses and, also, plats or maps, copies of which were elsewhere admitted in evidence. This report is too lengthy to be set out *in extenso,* and the following excerpts are taken therefrom to illustrate the general character of the report:

''The interest of the federal government is primarily that of navigation on the San Joaquin River, and the maintenance of navigable waters to the city of Stockton. The San Joaquin River has a difficult debris problem to contend with. For maintaining a necessary deep water channel in that stream, thousands of dollars are spent annually for dredging, straightening channels, etc., and upon the assumption that prevention is better than cure, it is realized that the

ideal way to control the debris is to prevent it from reaching the river at all, if such a scheme be economically feasible. Prior to the construction of the Stockton diverting canal, completed in 1910, the government had expended for dredging in a period of 23 years, up to 1908, the sum of $233,000 to maintain open channels in Stockton and Mormon sloughs. The debris thus dredged came principally from the Calaveras River floods, and the expenditure of about $10,000 per year for this purpose, capitalized at 5 per cent, represents interest on $200,000.

"While it is true that since the construction of the canal the government has been relieved of much of this dredging work in Stockton and Mormon channels due to the fact that silt has been deposited in the canal and the lower Calaveras River, such use of the diverting canal cannot be considered as a permanent solution of the debris problem. The canal is now filled several feet deep with sediment and its capacity greatly reduced, and it is apparent that a continuation of its effectiveness will necessitate extensive and regular dredging of the canal and lower Calaveras River, before many years elapse. . . .

"The city of Stockton lies directly in the path of the Calaveras flood waters. Levees have been built around the city to keep out the high water of the Calaveras and San Joaquin rivers, but these levees do not afford complete immunity from danger. The levee built in connection with the construction of the diverting canal saved the city from a most disastrous flooding from the east side in 1911, but the city continues to be menaced by Calaveras water from other directions.

"Aside from the actual saving of property due to keeping out the flood waters, it is unnecessary to enlarge upon the advertising value to a city to be able to assure investors and prospective residents that flood dangers have been removed. As an instance of this, it is stated that a considerable portion of the growth of Stockton's population and industries of recent years has been due to the partial security afforded by the presence of the diverting canal levee east of the city.

"It should also be emphasized that the prosperity of a city is in direct ratio to the prosperity of the surrounding country, tributary to that city. Stockton's interests are in-

separable from the interests of the agricultural country surrounding her, of which territory she is the business and shipping center, and to the extent that flood control on the Calaveras River contributes to the upbuilding of that country. Stockton has an indirect but very definite interest in the project. . . .

"The flood of 1911 was the highest of which we have record and is stated to have been the greatest within the memory of old settlers—since that of 1862. Aside from the flood of 1911, however, it will be seen that floods of between 30,000 and 40,000 second-feet may be considered of possible occurrence during any season. After the March rains the discharge rapidly decreases and during the summer and autumn months the flow is practically nothing and does not pick up until the storms of the following winter.

"Although the records of the U. S. Geologic Survey only extend from 1907 to date, it is fortunate that within that period have occurred seasons of both maximum and minimum runoff. As stated above, maximum conditions obtained in 1911, while the successive seasons of 1912 and 1913 comprised the driest two-year period experienced in California for many years. Nineteen hundred eight, which was also a dry year, was immediately preceded and followed by seasons of abnormal rainfall and so the scarcity was not so noticeable as in the case of the two-year period of 1912–13. . . .

"The specific location of the above area, comprising some 34,000 acres between the diverting canal and Bellota, is noted simply to give an idea of the magnitude of a feasible-sized irrigation project which could utilize the reservoir in conjunction with flood control. The use of the water is not limited by the topography to this area, however. If the farmers of this region do not wish to use the water there is plenty of land otherwise north of the Calaveras River and south of Mormon Slough that would be benefited by a gravity irrigation supply, and might perhaps be glad to get it.

"In an irrigation project comprising 34,000 acres of good land it is probable that 90 per cent or 30,600 acres will be under irrigation when fully developed. Figures are based upon the assumption that half the area goes into alfalfa and other crops requiring considerable water, and half put into fruit trees or vines. It is assumed that 2½ acre-feet

per acre net per year will be required for the alfalfa and 1.0 acre-foot net will be used on trees or vines. This gives a net requirement for the project of 1.75 acre-feet per acre, totaling 53,550 acre-feet, or practically 54,000 acre-feet annually. Estimating that losses between the reservoir and the land to which the water is applied amount to 40 per cent of the amount of water available, the gross requirement for the district will be 90,000 acre-feet per year. The water should be available for a season of six months. Using about 25 per cent of the total during each of the months of maximum demand would require a canal with a capacity of 375 cubic feet per second at the head, or 15,000 statute miner's inches. . . .

"This addition to the dam and reservoir will add to the cost of the project as outlined for flood control alone by the following amount:

"Additional masonry in dam, 60,000 cubic yards
    at $8 ...................................$480,000 00
"Additional acreage in reservoir, 1000 acres at
    $25 ................................... 25,000 00

                                    $505,000 00
"Contingencies, 15 per cent................... 75,750 00

                     "Total .....................$580,750 00

"For the irrigation of a tract of 34,000 acres this is at the rate of $17.17 per acre. Construction of canals and laterals to this tract will probably cost close to $25 per acre, making the cost for irrigation about $42 per acre. This latter estimate of canals and laterals is a general figure, and can only be determined accurately by a survey of the ditches proposed and ascertaining the yardage of material involved, but the figure given above is considered conservative.

"The details of the administration of the combined interests of flood control and irrigation would depend considerably upon whether the irrigation area lay within or without the flood control district. In any case it would doubtless be better to have two separate organizations, although the duties of the officers could often be combined and certain overhead expense thus eliminated.

"Following is a brief summary of the matter of the foregoing report:

"(1) The interests involved in the question of Calaveras River flood control are, United States government, State of California, county of San Joaquin, city of Stockton, public utilities operating within the flooded or menaced territory, and agricultural lands flooded or menaced.

"(2) The Calaveras River watershed extends to an altitude of 6000 feet with a mean elevation of about 2000 feet. It embraces 500 square miles above Bellota, 395 square miles above the Jenny Lind gauge of the U. S. Geologic Survey, and 368 square miles above the Valley Springs dam site.

"(3) Records of the flow of the Calaveras River kept by the U. S. Geologic Survey are available from 1907 to 1918. The record of the big flood of 1911 of the U. S. Geologic Survey is accepted as the best data available thereon, and matter of this report is based upon that record. The above period of observation of the river includes the consecutive dry seasons of 1912 and 1913, upon which figures of storage requirement for irrigation are based.

"(4) A comparison of a by-pass plan of flood control with that of utilizing the Valley Springs reservoir indicates the latter plan to be the more feasible.

"(5) An analysis of the reservoir requirements finds as follows, for full flood control:

"Capacity of channels below reservoir placed at 12,500 cubic feet per second.

"Capacity of reservoir, outlets, 7500 cubic feet per second.

"Capacity of reservoir, 163,000 acre-feet.

"Area of reservoir, 2900 acres.

"Maximum height of dam, 151 feet.

"(6) Diamond drill borings made at the Valley Springs dam site indicate a feasible and sufficient foundation thereat.

"(7) Figures on a partial protection scheme are offered, based upon reservoir capacity to accommodate yearly or normal floods, but not the unusual flood such as that of 1911. For this plan is found as follows:

"Capacity of reservoir, 89,000 acre-feet.

"Area of reservoir, 2100 acres.

"Maximum height of dam, 121 feet.

"Estimated cost of full protection plan, $1,613,450.

"Estimated saving in first cost of partial protection over full protection plan, $477,000.

"(8) It is not considered that this saving is justified on account of the great damage that would be caused by the abnormal floods.

"(9) The proposed flood control district includes 90,800 acres flooded or menaced by the Calaveras River water. The status of respective sections of this district is explained in the body of the report.

"(10) It is not assumed that all lands within the proposed district will be equally assessed. It is expected that some plan such as that used by the State Reclamation Board in large districts will be applied to determine the rates of taxation on different lands for benefits conferred by flood control.

"(11) It is considered that the problem of lands flooded or menaced by the present operation of the Stockton diverting canal is a question separate and apart from the general flood control scheme, and one that logically should be settled by the parties at interest without involving the proposed district further than that the general relief offered by such a district may make differences between those parties easier to settle.

"(12) A capacity of 284,000 acre-feet in the Valley Springs reservoir will provide storage for sufficient water to irrigate 34,000 acres through a two-year dry period such as 1912–1913, in addition to reserving sufficient capacity to safely control any flood of the magnitude of that of 1911. Such additional storage is estimated to add to the cost of the flood control project $583,750, or at the rate of $17.17 per acre on a 34,000 acre tract for irrigation storage alone. A canal and lateral system to these lands will bring irrigation costs up to about $42 per acre."

This report refers also to the diverting canals built by the United States government to protect the City of Stockton from overflow and its insufficiency in that respect, also takes up the subject of constructing a by-pass and finally concludes with the general summary which we have herein set forth. The defense also offered, and over the objections of the plaintiff, the court admitted in evidence a report made by Charles E. Ashburner to the city council of the City of Stockton on the subject of flood protection for the

City of Stockton and its vicinity. This report includes copies of tables showing the run-off of the waters of the Calaveras River for a number of years, also takes up the subject of irrigation, the organization of possible irrigation districts, and the writing off of the initial expense of the cost of building the restraining dam for flood control purposes by the values created in the stored water. This report is also too long to be inserted herein, but we copy therefrom the following excerpts:

"We recognize that Stockton is menaced by flood waters from two sources, the Calaveras and its tributaries, and the Little John Creek, (including other small streams having their sources between the Calaveras on the north, and the Stanislaus on the south). The greatest menace confronting us to-day, however, is from the flood waters of the Calaveras River.

"The plan submitted proposes to protect the city from all flood menace and to furnish water for beneficial uses. Keeping the fiscal situation in view, it is proposed to eventually write off a large portion of the initial expenditure for flood control by the values created in the stored water; to initiate the work and to share these waters with adjoining communities upon fair and equitable terms.

"The dedication of irrigation water upon lands immediately adjacent to Stockton provides for all time the municipal supply of such area when later annexed by the expansion of the city.

"The dedication of water on neighboring lands and communities assures the growth of a higher and more productive contributory territory.

"Having in view the ultimate prosperity of the community, the question of flood control, water supply, and irrigation will be treated under the following chapters. . . .

"Damsite is located on the southwest quarter of Section Thirty-one (31) in Township Four (4) North, Range Eleven (11) East, M. D. B. & M.

"The site is in a narrow canyon between hills that rise about 200 feet above the bed of the river. The south bank rises steeply at an angle of about 30 degrees, while the north bank is flatter. The distance from hill to hill at the 690 foot elevation being approximately 1275 feet. The site

is well adapted for storage purposes, and has a maximum capacity of 350,000 acre feet.''

''The dam as described, 160 feet in height, in addition to affording regulating capacity against flood waters to the extent of 163,000 acre feet, which is the amount estimated to be necessary to reduce the flood waters to 7500 cubic feet per second, also furnishes storage for 37,000 acre feet of water to be put to beneficial uses, such as domestic water supply and irrigation.

''The surplus water insures for all times a water supply for the City of Stockton, but will not be needed for several years and can be used in the interim for irrigation purposes, thereby reducing the cost of flood prevention. The matter of augmenting the irrigation supply in order to release water for the municipal purposes is treated in subsequent chapters. The analysis of the matter is this: We have flood protection and storage space for water for municipal purposes and for irrigation. . . .

''To anyone who has studied conditions in the San Joaquin Valley, it is unbelievable that with water available at the above cost, that an irrigation district that would use all this water would not be formed within a very short time. . . .

''It should not be necessary to direct one's attention to the value of water to the lands in this community, or to the lands which could be irrigated from this source of supply. One need only look at the marvelous results which have been accomplished in the South San Joaquin, Oakdale, Turlock, Modesto and other irrigation districts of the San Joaquin Valley.

''All irrigable land below the 600 foot elevation lying between the Mokelumne River on the north, and the South San Joaquin and Oakdale districts on the south, are within the economic reach of this supply.

''In the foothill district of the Sierras lies a thermal belt where mild and equitable temperatures prevail throughout the winter, and on which citrus fruits thrive. The soils in the valleys of this foothill region in Calaveras County are of a sandy loam character, and are well adapted to the raising of deciduous, as well as the citrus fruits. One need only to look to the marvelous development of the fruit industry in Placer County around Loomis and Auburn.

"Lying in San Joaquin County below the 150 foot elevation is a vast acreage which should be under irrigation.

"North and east of Stockton in the vicinity of Lodi and Lockeford is a highly developed territory where land values of $1,000 to $1,500 an acre are not uncommon, and upon which irrigation by pumping is expensive and increasingly so with a falling water table, which has been very noticeable of late. Unless an economical gravity supply of water can be obtained for these lands, there must be a great depreciation in the value of the land and in the crops derived from the same.

"It is very noticeable that the crops raised in this section of San Joaquin County are seasonal, and do not bring in the steady monthly returns that would be derived from a more extensive dairy industry, which fact coupled with the condition that makes it necessary for the State of California to import a large portion of its dairy products, would lead us to believe that with sufficient water an industry can be built up in this section of the state that will be reflected in the general business of the community.

"Lying between the Calaveras River and the Mormon Channel is a large acreage of high productivity and increasing land values. In this territory the deciduous fruit and nut industry is rapidly developing. This territory like the territory in the vicinity of Lodi and Lockeford must of necessity resort to irrigation if productivity and land values are to be maintained.

"It is inconceivable that the residents of Stockton and vicinity and those of the foothill districts of Calaveras County should fail to see the enormous community benefit derived by us all from taking advantage of a situation which gives us too much water at one time in the year and too little at another.

"It is believed by some that water can be stored in the Mokelumne River for the purpose of developing electric power and irrigation. It is only necessary to make a thorough study of the situation to be convinced that although these things may be done, the enormous cost of storage of water per acre foot on the Mokelumne when compared with the Calaveras, makes the Mokelumne project financially unsound. . . .

"Is it possible that further endorsement of this method of control could possibly be required by anyone? It seems hardly necessary to speak of the small ultimate outlay for this project as security for the property and peace of mind of the citizens of Stockton."

[1] The theory upon which the Barnes report was admitted appears to be that it was referred to by the witness Hogan, in his testimony, in that he had copied certain tables therein contained, which were copies of tables made by the United States gauging officers, showing the run-off of the Calaveras River, and also had copied certain of the maps contained in said report, which were, in turn, copies of government maps and also that upon cross-examination, counsel for the defense had questioned the witness as to certain portions of said report. The maps and tables concerning which the witness was examined were admitted without objection, and specific portions showing the area of the watershed were likewise admitted. The remainder of the report, which includes all the excerpts which we have set forth, were admitted over the plaintiff's objection. It is further argued that the Barnes report is admissible under subdivision 6 of section 1918 of the Code of Civil Procedure. We do not find any of these reasons tenable. The Barnes report does not purport to be a state document. It shows upon its face (page 6) that it was denied legal authority by the state legislature. It also shows upon its face that it is a compilation of statistics and is the opinion of an engineer by the name of Harry Barnes, based upon the investigations conducted by him under his statement that it was made by him at the direction of W. F. McClure, state engineer. [2] No objection was made to the introduction of this report on the ground that it was not properly authenticated, but that fact does not make the opinions and theories contained in the report admissible in evidence in this case, because of the further fact that the report is not an official document, as that term is used in section 1918. It was not made in pursuance of any duty enjoined by law, but as therein stated, shows that it was expressly undertaken in the absence of such authority, and, therefore, constitutes nothing more than the private compilation, theories and opinions and estimates of the writer Harry Barnes. Had it been made in the line of official duty, in pursuance of an

investigation directed by the legislature or some of the code provisions of the state, then, and in that case, the authorities cited by the respondent would be applicable, but as it expressly appears to be the contrary, nothing has been called to our attention that would justify the admission of the results of the investigation, conclusions, opinions and statements of the writer of said report. The case of *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545 [147 Pac. 238], is not authority for the admission in evidence of the Barnes report. A reference to page 571 of the opinion in that case shows the report therein referred to to have been specially authorized by the provisions of the Political Code. Referring to section 332 of article XII of the Political Code, it will be noted that provision is made for the reports of certain officers of the state to the Governor. The officers therein referred to are to all intents and purposes the heads of the respective departments of the state government. These reports are then submitted to the state board of examiners, which board may, in its judgment, direct the publication thereof. The report in question was not made by the head of any department, was not made by the state engineer, as head of the department of public works. **[3]** No section of the Political Code relating to the department of public works has been called to our attention that would make the report by a subordinate officer or field officer to his superior, or whatever designation may be applicable to the position occupied by Mr. Barnes, a public document admissible in evidence in controversies between independent parties. These considerations show the opinions and statements of Mr. Barnes to be mere hearsay so far as this case is concerned and wholly inadmissible.

We will next consider the report made by Charles E. Ashburner, city manager of the City of Stockton, to the city council of the City of Stockton, bearing date of February, 1924. Respondent is in error in stating that only a general objection of incompetency, irrelevancy, and immateriality and hearsay was made to the whole of said report. If such were the case and any portion of the report were admissible, then it might be that a general objection would be insufficient, but an examination of the transcript shows that between five and six pages are covered by the special objections urged by counsel for plaintiff. These ob-

jections take up the Ashburner report chapter by chapter, and page by page, particularly specifying the portions of the report so specifically objected to, and calling the attention of the court to the particular portions of the report so objected to. Under these circumstances, if any of the chapters, paragraphs, or pages of the report are inadmissible, the court erred in its rulings.

[4] In support of the admissibility of the Ashburner report, the respondent urges two propositions: 1. That it was included in and made a part of certain resolutions adopted by the city council of the City of Stockton; and 2. That it is admissible as being an admission against interest by the City of Stockton, the plaintiff in this action. The first resolution referred to adopted by the city council April 24, 1924, among other things, contains the following: ''That it concurs in that portion of the report of the City Manager providing for a dam to control the flood waters of the Calaveras River and for a levee protecting the city against the waters of Little John Drainage System,'' and a further resolution adopted May 5, 1924, by the city council of the City of Stockton reciting the formal resolutions and containing the following section: ''That the public interests and necessity demanded the acquisition, construction and completion by the City of Stockton of certain municipal improvements, to-wit: the construction of a restraining dam on the Calaveras River in the Southwest quarter (SW¼) of Section 31, Township Four (4) North Range Eleven (11) East, Mount Diablo Base and Meridian, for the protection of the City of Stockton from floods and for the use of said impounded water for such purposes as shall not be inconsistent with the purposes mentioned in said resolutions.'' Another one of these resolutions purported to adopt the Ashburner report further than the first resolution concurs in that portion thereof relating to flood control of the waters of the Calaveras River for protective purposes, and if the first resolution which does concur in the Ashburner report in so far as flood control is concerned be treated as an adoption thereof and as a part of the resolution of the city council, that would not admit the other portions of the report which are merely arguments and opinions relating to other matters and which, therefore, became purely hearsay statements and opinions by Mr. Ashburner. [5] Nor can

we agree with counsel that the Ashburner report, extracts from which we have set forth herein, constituted admissions by the city council. At the time in question, neither Ashburner nor the city council was in a position to make any admissions against the interest of the City. They had no authority at that time to undertake the work contemplated. It was a matter subsequently to be passed upon by the electors of the municipality. **[6]** It is one of the cardinal principles of an admission that the party speaking must be in a position of authority to speak. The cases relied upon by the respondent in his position upon this question do not seem to us to be in point. In the case of *Los Angeles City Water Co.* v. *Los Angeles,* 88 Fed. 720, argued at length in respondent's brief, the question presented was primarily the data upon which the water rates of the city of Los Angeles were fixed. It appears that the committee examining and passing upon the schedule of rates had taken as its guide data and rates theretofore fixed. The court said: ''A corporation, municipal as well as private, is bound by the declarations of its officers, where such declarations accompany and are explanatory of an act done by the officers in the scope of their authority.'' The committee were in the performance of duty expressly enjoined upon them by the City and the statements in their reports that they had followed · the rates charged in July, 1868, were explanatory of the rates they had established. These matters were therefore held admissible, as data upon which the committee had acted. Likewise are the cases relating to declarations made by a state commissioner when engaged in the performance of some particular duty to show knowledge of what might result from the performance of that particular duty. Admissions which show knowledge on the part of officers, as in the case of *Weir* v. *Plymouth,* 148 Pa. 566 [24 Atl. 94], have frequently been admitted where it is necessary to bring home knowledge to an officer charged with neglect of duty of a defective street or sidewalk or instrumentality under the control of or belonging to a municipality. These cases are entirely beside the question, as presented in the consideration of the admissibility of the Ashburner report. The city council, by its resolutions, explicitly excluded every other consideration than that of flood control in its resolution concurring in the report made

to the city council. The fact that the city council in a subsequent resolution used the words ''for the protection of the City of Stockton from floods and for the use of said impounded water for such purposes as shall not be inconsistent with the purposes mentioned in said resolutions'' does not open the door for the admission of hearsay testimony or the opinions or conclusions of Mr. Ashburner as to the feasibility of using the impounded waters for irrigation purposes, or as to the revenue that might be derived for power purposes, or for purposes of irrigation. The sale of such waters might possibly, as said by Mr. Ashburner, ''eventually write off a large proportion of the initial expenditure for flood control by the values created in the stored waters,'' but this statement, in addition to being hearsay, as introduced in this case, is pure speculation and is entering upon a field condemned by an almost unanimous current of authorities dealing with eminent domain proceedings. While the general objection to the introduction of this testimony that it is incompetent, irrelevant, immaterial, and hearsay might not have been sufficient to exclude that portion of the Ashburner report concurred in by the resolutions of the city council of the City of Stockton relating to flood control, as heretofore stated, the record shows that the report was objected to, page by page, chapter by chapter, so as to call the attention of the court to the specific parts of the report which could not, under any view of the case, be considered as relating merely to flood control. The figures relating to what it would cost per acre to furnish water for irrigation purposes were withdrawn from the offer of the report in evidence; but the fact of profit hoped to be derived from the venture was left before the jury for its consideration, as shown by the excerpt above quoted relating to the writing off of the initial expense. In this particular, we may again refer to the Barnes report where the cost of furnishing water for irrigation under the plan proposed by the testimony of the defendant's experts, above referred to, is estimated at $42 per acre. The Barnes report differing from the testimony of the experts only in that the proposed dam is given an altitude of only 190 feet instead of 200 feet. From these reports and the testimony of the experts the entire project was before the jury as clearly as could be in the form of a completed enterprise. The dam was there before them, 200

feet in height, canals on either side of the river came into
being, conducting water down to a point near Jenny Lind,
where through penstocks the water was being dropped from
200 to 250 feet upon waiting water-wheels which, in turn,
gave motion to great dynamos, producing a current carrying
light and heat to thriving cities in the valley while the im-
pounded waters, having discharged this duty, were carried
forward through diverting ditches to some 34,000 acres of
lands lying below the foothills at an approximate cost of
$42 per acre, a limited portion of the water being taken
through conduits to the cities needing impounded water for
municipal purposes, the cost of the enterprise being grad-
ually written off by the revenue derived from the sale of the
impounded waters for power and irrigation purposes. It
is true that this picture existed only on paper but the reports
referred to enabled the jury to visualize the speculative
project as an actuality and measure the market value of the
flowage easement sought over the defendant's lands ac-
cording to the standard thus presented. These reports fol-
low directly in line with the predicate set forth in the
question asked of some of the expert witnesses, which we
have heretofore quoted, and again insert here the following
excerpt: ''Q. This is an action by the plaintiff in this case
to obtain a perpetual easement on the Vote lands lying
below the 680 foot contour for the purposes of protecting the
city of Stockton by flood control from floods and for the pur-
pose of using the impounding water in such a reservoir for
such purposes as shall not be inconsistent with the purposes
of flood control, etc.,'' and unfolded to the jury a specula-
tive purpose of using the impounded waters. [7] All the
authorities agree that the purposes for which the water is
to be used by the plaintiff in eminent domain and the bene-
ficial purpose to be derived therefrom are not to be taken
into consideration in determining market values. Avail-
ability may be shown, but the purposes and uses, necessity,
and values of or to the plaintiff in such actions are wholly
irrelevant matters. These matters all tend to base the esti-
mate of market value on what the plaintiff can afford to
pay rather than forego the exercise of the right of eminent
domain.

[8] Again, in the testimony of the witness Polk, the
same speculative testimony appears where reference is made

to the possible growth of the City of Stockton and the estimated quantity of water that would be necessary to supply the wants of that City twenty years hence. The same is true of the testimony of the witness Ellis, where he describes his familiarity with the growing demands for water by the municipalities in the valley and stating the situation in the City of Stockton which injects also the needs of said City into the question of determining market values.

The voluntary statements of the witness O'Shaughnessy as to the condition of the municipal water supply of the City of Stockton and as to the revenue that might be derived by the City of Stockton from the sale of the energy contained in the impounded waters for power purposes not having been made the subject of a motion to strike out are not considered herein, but this does not obviate the errors in the admission of testimony covering practically the same subjects over the objection of appellant, as elsewhere referred to in this case.

Both parties to this controversy place reliance upon the opinion in the second appeal of the case of *San Diego Land etc. Co.* v. *Neale,* 88 Cal. 50 [11 L. R. A. 604, 25 Pac. 977]. This case has been considered in subsequent decisions of the supreme court, notably in *Sacramento etc. R. R. Co.* v. *Heilbron,* 156 Cal. 408 [104 Pac. 979]. The court, in the Neale case, thus sets forth its views of the law applicable to situations such as are presented here:

"The cost of works necessary for the utilization of the land for reservoir purposes was an element in the calculation as conjectural and speculative as would be the cost of a railroad and running stock necessary for the operation thereof in fixing the value of land condemned for railroad purposes. The quality and condition of the lands to be affected was as foreign to a legitimate estimate of the market value of the land as the size and growth of a city on the line of the railroad would be in fixing the value of land taken for railroad purposes. The necessities of the public are never taken into consideration in fixing the value. They are an element which must be proved before the land can be taken, but are never an element of the question as to compensation. The proportion which the defendants' lands bore to the remainder of the plaintiff's reservoir, and the quantity of water which would be stored by use of the de-

fendants' land in connection with the land of plaintiff, and the value of the water as a salable commodity, were clearly improper elements to be considered. (*Tide W. Canal Co. v. Archer*, 9 Gill & J. (Md.) 481, and other cases.)

"The question was, not what the property was worth to a person intending to acquire it and the dam site and the remainder of the reservoir by purchase or condemnation for the purpose of supplying water over a territory tributary to the system, but what was the market value of the property itself. In other words, what the defendants could have obtained for their land if it had been offered for sale in the market, a reasonable time being given within which to make the sale. The plaintiff must compete in the market with *bona fide* purchasers generally, but its necessities cannot be taken advantage of. So far as the value of the land in controversy may have been increased to purchasers generally by the construction and use of the plaintiff's dam and reservoir, or as a part of the entire reservoir site, such fact should be considered, but the value of the land when used in connection with the plaintiff's land cannot be taken as a criterion, for this would be taking the value to the plaintiff as the measure of compensation. The jury had a right to consider the fact, in determining the market value, that the land in controversy was in proximity to a dam site, and to consider its adaptability for reservoir purposes, and to determine whether or not its market value had been enhanced by improvements put upon adjoining property; but for the reasons stated its adaptability for reservoir purposes should not have been considered 'in connection with such dam site and other adjacent lands.' . . .

"It is sufficient to say that any facts showing the nature of the land in controversy, and its adaptability for reservoir purposes, may be shown. The area of the water-shed and amount of water were matters proper to be considered; for a reservoir would be useless without water. That there was land irrigable from the reservoir, and cities and towns which were being supplied with water from wells, were matters not only tending to show that it was a practical reservoir site, but bearing directly upon its value. The condition of the property, the uses to which it may be put, having regard to the existing advantages for making a practical use of the property, and such advantages as may

be reasonably expected in the immediate future, are all matters for consideration in estimating the value of the lands (*Boom Company* v. *Patterson,* 98 U. S. 403 [25 L. Ed. 206]); but to attempt to ascertain the value by estimating the cost of works necessary for its use for a particular purpose, the cost of operation, prospective sales and estimated profits, increased demands through growth of population, etc., requires 'a degree of refinement in the measure of values which seem to us totally incompatible with the gross estimates of common life. . . . The gross estimates of common life are all that courts and juries have skill enough to use as a measure of value. All other measures are necessarily arbitrary and fanciful.' (*Searle* v. *Lackawana & B. R. Co.,* 33 Pa. St. 64.)''

In the Heilbron case, after a review of a number of the preceding authorities and of the opinions in the Neale case, the law applicable is thus stated:

''The present market value of the land is the measure of damages, and not its value in use to the owner or to the parties seeking to condemn. There is nothing in the Neale case indicating a different rule. The availability of the property for any particular use may be shown, and in the present case all the facts bearing on the use to which the building was adapted and for which it was being used were shown. It is seen, therefore, that this court by its latest utterances had definitively aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the land at the time it is taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; that therefore while evidence that it is 'valuable' for this or that or another purpose may always be given and should be freely received, the value in terms of money, the price, which one or another witness may think the land would bring for this or that or the other specific purpose is not admissible as an element in determining that market value. For such evidence opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question—that of market value—the highest sum which the property is worth to persons

generally, a purchasing in the open market in consideration of the land's adaptability for any proven use.''

A reference to the testimony which we have heretofore set forth and the predicate contained in the questions asked, as well as the answers of the witnesses, show that their estimated market value of the land was really an estimate of what they thought the land was worth for a specific purpose. The two purposes were set out and the statement incorporated in the question propounded to the witnesses relative to market value. [9] The opinion in the Neale case shows ''that the necessities of the public are never taken into consideration in fixing the value.'' [10] The necessities of the City of Stockton were presented to the jury in this case, as shown by the testimony, relative to its water supply, as hereinbefore set forth. Likewise, the growth of the City of Stockton is a subject held inadmissible by the Neale case. [11] The Heilbron case is directly in point in holding that the value in use of the land sought to be condemned is inadmissible. The reports which were admitted in this case set forth the value in use, as we have heretofore shown. [12] As said in the concurring opinion of Justice Harrison in *Spring Valley W. W.* v. *Drinkhouse,* 92 Cal. 528 [28 Pac. 681], the land ''may be adapted for a reservoir site, but its value for such purpose would be qualified by the prospect, greater or less, of anyone seeking to build such a reservoir. Its market value is affected by such contingency, but it is not to be determined by the fact that the party seeking to condemn it has already determined to build a reservoir. To allow that element to enter into the computation would be to make the plaintiff's necessity the owner's opportunity.''

[13] Excluding the Ashburner report and the Barnes report and the elimination of the speculative parts of the testimony given by the experts, to which we have herein specifically referred, we do not find anything in the record in this case which violates the rule laid down by the supreme court in the Neale case as limited and applied by the Heilbron case. The fact that there was a watershed upon the Calaveras River capable of affording a run-off of rain-water sufficient to fill a reservoir containing 350,000 acre-feet of water, that there were lands susceptible of irrigation lying within a reasonable distance of the reservoir site and also

cities or municipalities in the San Joaquin Valley were matters which anyone contemplating a purchase of the premises in question might very well take into consideration in determining the value of the land which he was about to buy, and if these are matters which an intending purchaser might consider, they are proper matters to be laid before the jury. [14]   The fact, also, that the highest use of the land to which it was adapted for such purposes would be subserved by a 200-foot dam, we think, is also admissible.   Testimony on the part of persons qualified to speak on such subjects was also proper to be laid before the jury.   [15]   The fact that the party seeking to condemn was not proposing to make the highest use of the condemned property is not a matter to be taken into consideration in determining values, any more than the value of the use of the property to the condemnor is likewise not to be considered.   Both of such elements are inadmissible.   The rule for determining values is set forth in the Heilbron case, *supra*, is also fully set forth in the case of *Black* v. *Mayor and City Council of Baltimore,* 125 Md. 378 [Ann. Cas. 1916E, 880, 93 Atl. 994], following the rule laid down in the Heilbron case.

[16]   The Black case, *supra*, is also authority for the proposition that adaptability of a defendant's land for reservoir purposes may be taken into consideration, although his land alone does not constitute an entire reservoir site and a complete reservoir site requires the joining of his land to a number of other tracts of land belonging to different owners.   The record in this case shows that the lands included within the proposed reservoir site are owned by at least thirty-two different persons, but we do not find in the transcript anything further that would lead to the declaration, as a matter of law, that it is impracticable to join all of the lands with the lands of the defendant to form such reservoir.   In the case of *Medina Valley Irr. Co.* v. *Seekatz,* 237 Fed. 805 [151 C. C. A. 47], the court, in its opinion, sets forth an apparently contradictory ruling.   It was there said: ''The defendant was entitled to be paid the value of his land as it was held and owned by him, but was not entitled to a proportion of an advance in value of a much larger tract due to a union of his land with the lands of a number of other proprietors.   The contest in this case was enough to show that it was not to be assumed that it was reasonably

practicable, without an exercise of the power of eminent domain, to bring together into one ownership the sundry parcels of land required to constitute the reservoir site, the value of which was deposed to. The defendant was not entitled to share in an enhancement of value attributable to an expected exercise of that power.'' (Citing a number of cases.) The facts upon which this holding is predicated are not very clearly set forth in the opinion. It does appear, however, that a different rule as to ascertaining values in such cases was followed than that prevailing in this state, in that the value of the lands for the purposes for which it was being condemned, and not its market value, was really being considered. It appears also that the testimony admitted covered such questions as the estimated returns upon the land when used for reservoir purposes. What the facts were tending to show that the lands could not be joined in one ownership does not appear. In the case of *Board of Water Supply*, 58 Misc. Rep. 581 [109 N. Y. Supp. 1036], and authorities having to do with the Ashokan reservoir site, cited by appellant, the number of property owners was so great and the interests in the lands necessary to be taken and united in one interest to constitute a reservoir site were so diversified, contingent, and far-reaching, it was apparent to the court that the value of any particular site, lot, or tract of land as part of a reservoir could not be enhanced in its market value, by reason of the obstacles necessary to be overcome in uniting the lands in one ownership. The facts of this case are so dissimilar from the one at bar that we think the conclusions there reached are not controlling here. We think the true rule applicable to this case is set forth in the case of *Gearhart* v. *Clear Springs W. Co.*, 202 Pa. 292 [51 Atl. 891]. There the supreme court of Pennsylvania holds this question to be one of fact. We quote from the opinion of the court in that case: ''The location alone fixed the value. Whether the land was available for the use testified to was a question of fact, and the argument directed to the court against the admission of the testimony should have had great weight with the jury in determining the value. The question was submitted with instructions that if the land, by itself, could not be used for building a reservoir, an estimate of its value for that use in connection with other properties which the

plaintiff did not own, and could not acquire, should be disregarded by the jury." [17] If it should appear in the case at bar that there are other lands which the defendant does not own and cannot acquire, then and in that case, which is a fact for the jury to pass upon, the value of the land for reservoir purposes should be eliminated. [18] In other words, the practicability of uniting the lands in one ownership for reservoir purposes, and the cost and expenses thereof, and the time consumed in so doing, are elements of fact which would bear upon the market value of the premises in question, and, we think, would be considered by any *bona fide* purchaser of the land purchasing for any purpose for which the land is reasonably adapted, and where the land is only a part of a larger tract owned by a number of individuals, all of these facts should be submitted to the jury under proper instructions to take into consideration whether the location of the land does or does not add to its market value by reason of its adaptability for reservoir purposes when joined to other lands. It is apparent that in and of itself the tract of land belonging to the defendant is not adapted for reservoir purposes, and hence no market value was affected by such adaptability. It is only when such union has been effected and the practicability of such union is a matter of fact. These questions, we think, were substantially covered by instruction No. 29, given by the court to the jury, which instruction sets forth the law as favorably for the plaintiff as the testimony and the transcript warranted.

[19] We do not think it necessary to go into the question of alleged errors by the court in permitting hypothetical questions to be answered where the questions simply set forth as a basis the hearing of testimony of other witnesses by the expert, and upon whose testimony the opinions were based, further than to say that the better practice is to set forth in the hypothetical question the facts upon which it is sought to illustrate the opinion of the witness being examined. In other words, if error has been committed in this particular, it is not sufficient, in and of itself, to warrant reversal.

[20] Our attention has been called to section $4\frac{1}{2}$ of article VI of the state constitution, in support of the verdict rendered by the jury. It is set forth that the jury must

have disregarded the values fixed by the experts, in that they set a valuation of about $240 per acre upon the 66.6 acres, while the jury allowed only $100 per acre. There is some testimony to the effect, outside of the testimony of the experts introduced by the defendant, that the land was worth $100 per acre. Some of the witnesses testified it was worth $150 per acre. On the part of the plaintiff in rebuttal much testimony was offered to the effect that the land was grazing land and was worth but little over one-fourth of the sum allowed by the jury; that the improvements were not worth anything like the sum awarded by the jury, and that the total valuation was only about one-half the damages awarded by the jury. Under these circumstances we do not very well see how it can be held that the inadmissible testimony to which we have referred be other than prejudicial to the rights of the plaintiff in this action. The testimony of the experts, which we have hereinabove set forth and referred to, except as to the limited parts specified, we think admissible, but when supplemented by the Ashburner and Barnes reports an entirely different and completed picture was presented, carrying with it the semblance of official or state authority. We have not discussed the question as to the qualification of the experts or others to give opinions, as the law on that question seems well settled, and may not be presented in any subsequent trial. What we would have to say could not be other than a repetition of the rules of law already well established.

The errors set forth necessitate a reversal. [21] Under the law a land owner is entitled to the full value of his land, when finally ascertained, exclusive of costs. For that reason costs on appeal herein must be charged to the appellant.

It is hereby ordered that the judgment herein be and the same is hereby reversed and the respondent will have and recover his costs on appeal.

Finch, P. J., and Hart, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 2, 1926.