[Civ. No. 51881. Second Dist., Div. Three. July 26, 1978.]

Estate of BERNARD J. WITLIN, Deceased.
ELSIE E. WITLIN, as Executrix, etc., Plaintiff and Appellant, v.
RIO HONDO ASSOCIATES et al., Defendants and Appellants.

COUNSEL

Hillel Chodos for Plaintiff and Appellant.

Ervin, Cohen & Jessup, Allan Browne, Allan B. Cooper and Allan Gabriel for Defendants and Appellants.

## OPINION

**COBEY, J.**—Defendants, Rio Hondo Associates, an approximately 45-member partnership composed largely of doctors, which owns a successful hospital in Downey, California, and generally those doctors, appeal from a judgment against them entered upon a jury verdict of compensatory damages in the principal sum of $208,869.14 and from an order denying their motion for judgment notwithstanding the verdict. Plaintiff, Elsie E. Witlin, as executrix of the estate of her late husband, Dr. Bernard J. Witlin, cross-appeals from the same judgment insofar as it fails to award her any punitive damages.

The basic issue presented by the appeal is whether appellants, in purchasing Dr. Witlin's interest in the partnership for $65,288.40, violated their fiduciary duty to plaintiff of full disclosure. Under the partnership agreement defendants were obligated to pay to plaintiff the fair market value of Dr. Witlin's partnership interest as determined in good faith by the partnership's management committee. This committee fixed the buy-out price of Dr. Witlin's interest on the basis of a certain executory

agreement between the partnership and three doctors entered into in the spring of 1971. This price of $24,600 per percentage point was substantially below the $83,905.62 per percentage point that the partnership realized in June 1972, when it sold its assets to Hospital Corporation of America. The jury's challenged award of $208,869.14 in compensatory damages to plaintiff reflects exactly the June 1972 selling price.

This case was improperly tried. The trial court never seemed to realize that the basic issue to be resolved was *the state of mind* of the management committee regarding the fair market value of the partnership during the period they were engaged in purchasing Dr. Witlin's partnership interest—that is, from September 21, 1971, to February 8, 1972. Stated otherwise, did the $65,288.40 they offered Mrs. Witlin represent in truth and fact their *good faith* determination of the fair market value of Dr. Witlin's partnership interest. To resolve this good faith issue properly, the jury should have been informed regarding the exact basis of the valuation offered Mrs. Witlin—namely, the $65,288.40—and of any representations made by the management committee regarding the fair market value of the partnership to at least two of the three conglomerates to which it attempted to sell the partnership between 1969 and June of 1972.

## FACTS

On July 4, 1971, Dr. Bernard J. Witlin died. At the time of his death he was a partner in a partnership known as Rio Hondo Associates. The principal asset of this partnership was the Rio Hondo Hospital in Downey.[1]

By letter dated September 21, 1971, the management committee of the partnership timely notified plaintiff, as executrix of her late husband's estate, that the partnership was exercising its option under article 16 of the partnership agreement to purchase Dr. Witlin's 2.654 percent partnership interest for $65,288.40 ($24,600 per percentage point) and noted that this price was in excess of the article 16 price of $42,565.30 that the partnership was purportedly obligated to pay. The letter further informed plaintiff that the offered price per percentage point was that established in an executory agreement between certain doctors and the partnership for the sale to them of a minor interest in the partnership in

[1]Dr. Witlin's professional association with the hospital terminated about 1959 when, after two heart attacks, he went to Switzerland to study psychiatry. Upon his return to the United States, about 1962, he began the practice of psychiatry in West Los Angeles and Beverly Hills, and his association with the partnership thereafter was purely as an investor.

the spring of 1971. Enclosed with this letter were an evaluation of the partnership and a statement of the various partnership interests, including that of Dr. Witlin, all as of August 31, 1971.

Upon receipt of this letter and its enclosures plaintiff went to see her probate attorney, Bill Gene King, for advice as to whether she should accept the offer. King commenced at once an investigation of the offer's propriety. He ascertained that under article 16 of the partnership agreement the management committee of the partnership was required to make a *good faith* determination of the *fair market value* of the equity of all of the partners in the partnership as of the last day of the partnership's fiscal year (this was the calendar year), and then to apportion to each partner his proportionate share of that equity. The overall equity figure was, however, to be adjusted for profits and losses and capital changes occurring after the end of the fiscal year through the last month preceding the month of the offer.

By letter dated September 30, 1971, King informed the management committee that Dr. Witlin had valued his partnership interest at $86,000 shortly before his death and inquired as to the method the committee had used in valuing that interest. King also requested recent appraisals of the physical assets, the most recent balance sheets and the latest county property tax bills.

The general counsel of the partnership replied to this letter of inquiry on or about October 25, 1971. He reiterated that the determination of the value of the partnership had been made in accordance with article 16 but that the partnership had decided to use the higher figure resulting from a bona fide arms-length negotiation between the partnership and several doctors seeking to acquire an interest in the partnership "for its good faith determination" of the value of Dr. Witlin's partnership interest. He enclosed balance sheets of the partnership and the hospital, dated respectively August 31, 1971 and July 31, 1971, and the most recent county tax bills.

From this data King determined a straight book value of the partnership of approximately $1 million and added thereto an estimated appreciation in physical assets of another $1 million as reflected in the county tax bills. He thereupon recommended to his client, Mrs. Witlin, acceptance of the partnership offer of $24,600 per percentage point since his corresponding figure was roughly $20,000 per percentage point.

No one from, or representing, the partnership ever mentioned to King the possibility that the partnership might sell its hospital and related

assets. Mrs. Witlin, on the recommendation of her attorney, thereupon accepted the management committee's offer. The mechanics, though, of obtaining the necessary authorizations from the probate court and the commissioner of corporations took several months and it was not until February 8, 1972, that this sale of the partnership was consummated through an exchange of a cashier's check and an executed assignment and receipt.

Meanwhile, some two months earlier on December 10, 1971, the management committee commenced negotiations with Hospital Corporation of America for the sale of all of the partnership's assets to that corporation. These negotiations continued unabated until June 21, 1972, when the parties to them executed an agreement of sale. Under this agreement Hospital Corporation of America paid in cash, through an escrow of its shares, to the partners of the partnership, $8,390,562, or roughly $83,906 per percentage point of partnership interest.

## DISCUSSION

1. *The Evidence of the Fair Market Value of the Partnership Adjusted to August 31, 1971*

■ Appellants contend that the only evidence in the record before us of the fair market value of the partnership adjusted to August 31, 1971, was the $16,038 per percentage point referred to in the option-exercise letter of September 21, 1971, the $24,600 corresponding figure actually offered by the partnership and accepted by Mrs. Witlin, and the about $32,403.92 value per percentage point estimated by Dr. Witlin himself. They dismissed the $83,906 per percentage point derived from the June 21, 1972 sale of the partnership as being too remote in time.

This contention of appellants involves several errors. First, it confuses the issue before us. This issue, as previously noted, is whether the $24,600 figure offered by the management committee to Mrs. Witlin actually represents their good faith determination of the fair market value of the partnership adjusted to August 31, 1971. Since the committee at this time chose not to offer Mrs. Witlin the $16,038 figure, its validity in the respect just mentioned is not directly before us.[2]

---

[2]For this reason we need not consider appellants' claim that this formula price represented an executed oral modification of the partnership agreement or their further claim that the trial court should have permitted inquiry by appellants over plaintiff's objection as to whether Dr. Witlin knew during his lifetime of this formula and its use.

Secondly, the sale figure of June 21, 1972, is not too remote in time to constitute solid evidence of the fair market value of the partnership about 10 months previously. Dr. Kaplan, a member of the management committee from 1966 through 1971, testified in effect that there was no change of any significance in the fair market value of the partnership between the time of Dr. Witlin's death and the date of the sale of the partnership to Hospital Corporation of America in June 1972.

Under these circumstances the jury quite properly considered this sale price in determining the fair market value of the partnership adjusted to August 31, 1971.[3] A sale of the partnership made within a reasonable time after the requisite date of valuation (Aug. 31, 1971) is a proper comparable sale. (Cf. Evid. Code, § 815; see *County of Los Angeles* v. *Hoe* (1955) 138 Cal.App.2d 74, 79-80 [291 P.2d 98], overruled on other grounds; *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 495 [93 Cal.Rptr. 833, 483 P.2d 1]; 1 Orgel, Valuation Under the Law of Eminent Domain (2d ed. 1953) § 139, pp. 590-591; 5 Nichols on Eminent Domain (3d ed. 1975) § 21.31[2], pp. 21-72, 21-73.)

The jury was also correct in rejecting the $16,038 figure. It is true that the management committee had used this adjusted book value approach to fair market value previously in the partnership's purchases from two widows of their deceased husbands' partnership interests, and that the committee did develop for the partnership a formula for uniform valuation of the partnership and the partners respective interests therein from 1966 through August 31, 1971. This formula included retained earnings and accumulated depreciation.

■ But a determination of the fair market value of the partnership, made in accordance with such a formula, cannot be regarded as a good faith determination of such value because, being purely a book valuation, it does not include anything for goodwill or the going business value of a successful business. As said many years ago by Judge Swan of the Second Circuit "[a] going business has a value *over and above* the aggregate value of the tangible property employed in it." (Italics added.) (*Haberle Crystal Springs Brewing Co.* v. *Clarke* (2d Cir. 1929) 30 F.2d 219, 221, revd. on other grounds 280 U.S. 384 [74 L.Ed. 498, 50 S.Ct. 155]; see Note, *Good Will* (1953) 53 Colum.L.Rev. 661, 677.) ■ The goodwill of a successful established business represents the expectation of continued patronage of it by the public. (See Bus. & Prof. Code, § 14100.) Such goodwill is an indispensable element of the fair market value of such a business.

---

[3]Both plaintiff and appellants concede that the jury based its award of compensatory damages solely upon this sale figure.

■ The jury had to decide between two proffered fair market values—$24,600 and $83,906 per percentage point. The trial court improperly refused to allow evidentiary inquiry into the exact bases for these prices so that the jury could properly determine whether either or both were truly market prices—that is, the products solely of market considerations.[4] Since appellants were the ones, however, who by their objections blocked this inquiry, the trial court's errors in this respect were invited by them and they may not profit therefrom. (*Watenpaugh* v. *State Teachers' Retirement* (1959) 51 Cal.2d 675, 680 [336 P.2d 165].)

2. ■ *Appellants Breached Their Fiduciary Duty to Plaintiff by Failing to Make to Her a Full and Fair Disclosure of All Matters Substantially Affecting the Fair Market Value of the Partnership Then Known to Them*

Appellants owed such a duty to plaintiff as the widow and executrix of their deceased partner in purchasing from her their deceased partner's interest in the partnership. (See Corp. Code, § 15020.) Throughout the transaction they were bound to act toward her "in the highest good faith" and they were forbidden to obtain any advantage over her in the matter by, among other things, the slightest concealment.[5] (See Civ. Code, § 2228; *Vai* v. *Bank of America* (1961) 56 Cal.2d 329, 349-350 [15 Cal.Rptr. 71, 364 P.2d 247].) Yet the management committee never revealed to plaintiff or her representative, King, that the basic value in their formula for determining the fair market value of the partnership was book value alone.[6] Likewise, as already noted, the management committee did not mention to King the possibility that the hospital might be shortly sold.[7]

---

[4]The $24,600 price was a price apparently negotiated between April and December 1971 between three members of the hospital staff who generally had other professional associations with the partners and the partnership. These three doctors each purchased a 1 percent partnership interest. On appellants' objection on the ground of irrelevancy, the trial court refused to permit plaintiff to ascertain whether this price was a true market price.

We note that since this sale was only of an *unallocated* fractional interest, it could be regarded as noncomparable.

[5]This fiduciary duty lasted from the management committee's offer of September 21, 1971, until the consummation of the buy-out on February 8, 1972. (See *Arnold* v. *Arnold* (1902) 137 Cal. 291, 296 [70 P. 23]; *Laux* v. *Freed* (1960) 53 Cal.2d 512, 522 [2 Cal.Rptr. 265, 348 P.2d 873]; 60 Am.Jur.2d, Partnership, § 125, p. 50.)

[6]It is arguable that this fact should have become apparent to King on the basis of his own investigation. In any event, the computation of this base for the formula was never revealed either to plaintiff or to King.

[7]In fact, the trial court on appellants' objection refused to permit inquiry by plaintiff as to whether the management committee discussed in negotiations with third parties what the fair market value of the partnership was.

This possibility of sale was quite real. It appears from plaintiff's improperly rejected offers of proof that the management committee reached in 1969 a tentative agreement with General Health Services to sell the partnership's assets to it for approximately $60,000 a percentage point, that between April and September 28, 1971, the management committee and the American Cyanamid Corporation were discussing a sale of the partnership to it for at least $93,000 a percentage point, and, as already noted from the evidence itself, that the partnership's assets were finally sold in June 1972 to Hospital Corporation of America for about $84,000 a percentage point.

The management committee knew all of this, but they apparently never breathed a word of it to either plaintiff or her attorney. It seems that in discussing the fair market value of the partnership they talked out of both sides of their mouths. They talked to plaintiff and her attorney in terms of $16,000 and $24,600 per percentage point while they were more or less simultaneously talking to conglomerates interested in purchasing the hospital and the other assets of the partnership in terms of selling prices ranging from $60,000 to $93,500 per percentage point. Given this situation, how could their offer of $24,600 per percentage point to plaintiff have been a good faith determination on their part of the fair market value of the partnership? Obviously the jury's verdict was correct and solidly supported in this respect.

### 3.   *There Was No Instructional Error*

■   Appellants contend that the trial court committed reversible error in refusing to give to the jury their requested instruction defining a presumption and indicating its tentative effect.[8] They assert that the giving of this instruction was necessitated by the fact that the jury was instructed at some length on the presumptions of insufficient consideration and undue influence arising from the fiduciary relationship of the parties.[9] In this connection they call our attention to the fact that the last-mentioned instruction was the only instruction that the jury requested be reread to them.

---

[8]This requested instruction reads: "A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action. A presumption is not evidence. Each of the presumptions involved in this case is known as a rebuttable presumption, which means that it may be overcome by a sufficient showing. When I instruct you on a presumption, I will so instruct you on the showing necessary to overcome it."

[9]This instruction, requested by plaintiff, but given as modified at the request of appellants, reads: "The relationship between a deceased partner's widow and executrix on the one hand, and the surviving partners on the other, is known in the law as fiduciary relationship, in which the surviving partners are in the position of trustees, and the

We do not think that the giving of this last-mentioned instruction, as modified, necessitated the giving of appellants' requested instruction. We think it clear that in the modified instruction the jury was correctly informed that the presumptions of insufficient consideration and undue influence were not conclusive. Furthermore, before the challenged instruction was given, appellants specifically accepted the proposed instruction after it had been modified at their request.

## 4. *The Cross-appeal*

■ Under the circumstances of this case plaintiff is not entitled to punitive damages. With her acquiescence, the jury was given a modification of BAJI No. 14.71 which directed the jury to award punitive damages "if and only if you find by a preponderance of the evidence that the defendants have been guilty of actual fraud." The jury's general verdict awarded zero punitive damages to plaintiff. From this verdict we must conclude that the jury impliedly found appellants guilty of only constructive fraud and not of actual fraud. (See Civ. Code, §§ 1572, 1573; *Southern Pac. Co.* v. *Unarco Industries, Inc.* (1974) 42 Cal.App.3d 142, 152 [116 Cal.Rptr. 847].) Needless to say, this is our view of the case as well.

### DISPOSITION

The judgment under appeal is affirmed. Costs on appeal are awarded to plaintiff, respondent and cross-appellant.

Allport, J., and Potter, Acting P. J., concurred.

---

plaintiff is in the position of a beneficiary of the trust. What this means is that the surviving partners must act in the highest good faith toward the widow and executrix of the deceased partner; that they are obliged to make full disclosure to her of all material facts affecting their exercise of the option; and they must not use their position to gain any advantage over her, or to make any special profit. All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which the trustee obtains any advantage from the beneficiary, are presumed to be entered into by the beneficiary without sufficient consideration, and under undue influence. However, it is not presumed that the trustee has acted fraudulently or in bad faith, the burden of proving fraud and bad faith remains on the plaintiff."